# IN THE COURT OF APPEALS OF IOWA

No. 20-0123
Filed August 19, 2020

IN RE THE MARRIAGE OF LAURA LEIGH DEWHURST
AND BRYAN MATTHEW DEWHURST

Upon the Petition of
**LAURA LEIGH DEWHURST, n/k/a LAURA LEIGH IMSLAND,**
        Petitioner-Appellant,

**And Concerning**
**BRYAN MATTHEW DEWHURST,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Story County, Bethany J. Currie, Judge.

A mother appeals the district court order modifying the custodial provisions of a dissolution decree and granting the father physical care of the parties' three children. **AFFIRMED.**

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Nicole S. Facio of Newbrough Law Firm, LLP, Ames, for appellee.

Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

Laura Imsland, formerly Laura Dewhurst, appeals the district court order modifying the physical-care provisions of the dissolution decree between her and Bryan Dewhurst. She also asks for an award of appellate attorney fees. We affirm the district court order and decline to award appellate attorney fees.

## I. Background Facts and Proceedings.

### A. Background Facts.

Laura and Bryan married in 2006 and divorced in 2015. They are parents of three children: a daughter, age twelve, and two sons, ages eleven and seven. In 2015, the district court entered a decree adopting the parties' settlement agreement resolving all the issues in their pending divorce. Laura and Bryan agreed that they would have joint legal custody of the children, Laura would have physical care of the children, and Bryan would have visitation every other weekend and once during the week from 4:00 p.m. to 7:00 p.m. Bryan agreed to pay $1687 in child support. His support obligation was reduced by $600 in October 2017.

At the time of the modification trial, both Laura and Bryan were thirty-eight years old. They had each remarried, and Laura had a two-year-old child with her new husband. According to Laura, the children all have a very close relationship with their half-sibling. During the marriage the parties lived in Ames, but after the divorce Laura and the children relocated to her hometown of Hubbard. Bryan moved from Ames to Hubbard in August 2018 to be closer to the children, and he now lives three blocks from Laura.

The parties encountered several issues as they tried to co-parent the children after the divorce. The overarching concerns were Laura's dislike and

mistrust of Bryan, the parties' communication issues, and allegations of Bryan's inappropriate conduct.

Many of Laura's concerns about Bryan derive from incidents during and toward the end of the parties' marriage. The most significant pre-divorce incident occurred toward the end of the marriage; Bryan tried to hypnotize Laura, who he thought was sleeping, to persuade her to perform sex acts on him whenever she heard a particular trigger word. Because Laura was awake and aware of his actions, Bryan's attempted hypnosis traumatized her. She views his actions as a sexual assault. Laura has spoken with family and church members about the incident but never sought out formal counseling. Laura also claimed, and Bryan acknowledged, that Bryan had a pornography addiction during the marriage. Bryan acknowledged the hypnotization attempt and testified at trial that he regretted his actions. Bryan addressed his pornography addiction through counseling sessions.

Due in large part to these pre-divorce incidents, Laura sees Bryan's attempts to communicate with her and the children as abusive, invasive, and controlling. Laura feels uncomfortable around Bryan and believes he does not respect boundaries. Laura will not acknowledge Bryan, his wife, or his family members in public, and she refuses to speak to Bryan in person. Her caustic behavior spilled over into how the children react to Bryan and his family when they are near their mother. At one point in 2018, she blocked his number on her cell phone. Laura refuses to let Bryan attend the children's birthday parties, even if they are in public, and she has refused Bryan's offers to help pay. Laura refuses to attend parent-teacher conferences with Bryan. After Bryan's child support

obligation was reduced in October 2017, she told the children that she would have to work more to pay the bills, which led to conflict between the children and Bryan. Laura often declined Bryan's requests for more time with the children and testified that she denied the requests because she views his relationship with them as unhealthy. She described Bryan as manipulative and controlling.

Other examples of co-parenting issues include Laura buying the oldest child a cell phone without telling Bryan. Laura did not provide Bryan with the passcode for the phone until after a mediation in February 2019. Laura believed it was okay for her to monitor the child's text messages with Bryan, but she believed it violated the child's privacy for Bryan to do the same because he took screenshots. Bryan tried to come up with ground rules for the child's cell phone with Laura, but Laura refused to engage. She also did not consult with Bryan before allowing the child to create an Instagram account. The child has three Instagram accounts, one of which uses her stepfather's last name. For a time, the child blocked Bryan from her accounts so he could not see her posts.

Bryan claims his relationship with Laura deteriorated even more after he moved to Hubbard in August 2018. Laura and her family members have told people in the community—including the children's friends' parents—that Bryan is "a creep," a "pervert," "not a good guy," and "a sexual deviant." The month after Bryan relocated to Hubbard, Laura posted a Facebook status stating in part, "A creep has moved into our community and anyone telling me 'they seem nice' will be corrected." Laura acknowledged at trial that this post was about Bryan. Bryan feels Laura's actions have caused issues with Bryan and his wife fitting into the

community and has caused concerns with the children's friends' parents allowing their children to spend time at Bryan's house.

Additionally, Laura resisted informing Bryan of the children's appointments and activities, would change their medical providers without telling him, would not provide Bryan with the copies of the children's birth certificates or social security cards, and expected Bryan to get all the information on his own. Bryan asserts he repeatedly requested that Laura keep him informed.

Laura also did not tell Bryan about the children's extracurricular activities. Bryan learned his daughter was participating in basketball from a social media post. In another incident, Bryan offered to purchase tickets to a father-daughter dance for himself, his daughter, and Laura's husband and to plan a dinner beforehand. Bryan later learned that his daughter and her stepfather went to a dinner with other fathers and daughters without him. Bryan was also not informed of a father-daughter bowling night, but his daughter attended the event with her stepfather, her stepfather's father, and Laura's stepfather. In 2018, the children participated in a Christmas program at church. The children downplayed their involvement in the program, and Laura did not tell Bryan about it. Bryan got the date and time from other church members, and it turned out that the children had major roles in the program.

Laura testified she was not fully aware of her responsibilities as a joint custodian and primary care parent until the parties participated in mediation in February 2019. She also testified that she did not believe she had an obligation to keep Bryan informed and that he could find out all the information himself. Bryan and his wife suggested using an online calendar, but Laura was resistant to it and

saw it as an invasion into her privacy. After the February 2019 mediation, however, the parties began using an online calendar, which helped alleviate most of the communication issues about events. Yet when met with these information hurdles, Bryan continued pressing respectfully, but firmly, for meaningful involvement in the children's lives. Witnesses confirmed Bryan's strong ability to parent and his good relationships with each child.

Several post-dissolution incidents became a focus during the modification trial. In August 2018, Bryan arrived at Laura's house to pick up the children. Bryan got out of his car to talk to his youngest child who was in the yard playing soccer while he was waiting for the other children to exit the home. Bryan claims he stayed on the sidewalk, about twenty feet from the house; Laura claims he was standing in the flower bed close to the home. When the other two children exited the home, Bryan looked over at them. Laura later accused Bryan of peeping into her home. After that, Laura refused Bryan access on the property for a time, requiring him to stay in his car during pickups.

In a September 2018 incident, which led to Laura's filing of the modification petition, Bryan had the children for weekend visitation and he and the children went to a relative's house in Nebraska. According to the oldest child, she and one of her younger brothers were watching television on an air mattress in the basement when Bryan came downstairs and tried to wrestle with her, which she resisted. Bryan started to wrestle her anyway, and eventually the child kicked Bryan in the throat. Bryan grabbed the child's upper thighs, and the child claimed this caused bruising. Laura testified she saw the bruising. According to Bryan, he was trying to get the children to come upstairs for dinner, so tickled his daughter's feet to get

her out of bed and she kicked him. After she kicked him, she began to fall off the bed, so he grabbed her thighs to prevent the fall.

The child reported the incident to Laura and the child's therapist, and both Laura and the therapist reported the incident to the Iowa Department of Human Services (DHS). DHS investigated the incident. During the investigation, Laura told the investigator that Bryan had "a history of 'sexual perversion,'" was a "sex and porn addict," and recounted the hypnotization incident. The investigator met with the child the next day. The child explained what happened and told the investigator that Bryan had never been aggressive with her before that incident. The investigator met with the middle child who confirmed his sister's story but added that he was comfortable with Bryan and the way he treats him and others. The DHS investigator concluded the allegation of abuse was not confirmed.

Due in large part to the September 2018 incident, Bryan's relationship with his daughter concerned both parties. The child started to see a new therapist in February 2019. The therapist determined a goal of therapy would be to build a better relationship between Bryan and the child. The therapist described the child as not being "comfortable" with Bryan, but the counselor found no evidence of sexual abuse, trauma, or posttraumatic stress. She did not see any evidence that Bryan's behavior was sexually motivated and saw no lingering fear or trauma from the September 2018 incident. The therapist worked with the child and Bryan on navigating physical affection, which the therapist described as common with a child and the opposite-sex parent. The therapist found Bryan "very receptive" and someone who "wanted to have a good relationship with [his daughter] and so he was willing to accept those boundaries or limitations in order to earn her trust and

be in a good relationship with her." The therapist testified that Bryan seemed like "a man who was willing to hear his daughter's issues, limitations, boundaries, and try to meet her halfway." Another issue the therapist noted was that the child's loyalty to her mother was possibly preventing the child from having a positive relationship with her father. The child had reported feeling concerned that talking to her dad in public would upset her mother.

**B. Procedural History.** In September 2018, Laura petitioned to modify the decree and change Bryan's visitation, alleging that Bryan physically and emotionally abused the oldest child. At the same time, Laura applied to have Bryan's visitation rights immediately suspended. Also in September, in a separate action, Laura petitioned for relief from domestic abuse, naming Bryan as the perpetrator, and citing events that happened during and after the marriage as evidence of abuse. She withdrew the request for immediate suspension and dismissed her protective order petition in October; she dismissed her request to modify the decree at trial.

Bryan denied Laura's allegations in the modification petition and counter-claimed to modify the dissolution decree to grant him physical care of the children. He alleged that Laura's failure to support his relationship with the children, her failure to communicate with him before making decisions, and his move from Ames to Hubbard all required a change in physical care. At trial he alternatively argued for shared physical care.

After the three-day bench trial, the district court entered a detailed written ruling, modifying the decree to grant Bryan physical care of the children and establishing Laura's visitation rights and child-support obligation. The district court

determined, "Laura's pattern of flagrant behaviors and interference over the past several years have not only hampered Bryan's relationship with the children, but her actions have negatively impacted the children and reflect a total disregard for their emotional well-being." The court ordered Laura to have visitation every Tuesday and Thursday from after school until 8:00 p.m. and every other weekend, along with more visitation in the summer. The court found her support obligation should be $302.61 monthly.

Laura appeals.

## II. Standard of Review.

Actions to modify the physical-care provisions of a dissolution decree are tried in equity. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). For that reason, our review is de novo. Iowa R. App. P. 6.907. We must "examine the entire record and adjudicate anew rights on the issues properly presented." *In re Marriage of Ales*, 592 N.W.2d 698, 702 (Iowa Ct. App. 1999). We give weight to, but are not bound by, the district court's fact findings, especially with regard to the credibility of witnesses. Iowa R. App. P. 6.904.

## III. Analysis.

**A. Modification Decision.** The law for custody modifications is well settled:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody

from the other must prove an ability to minister more effectively to the children's well being.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). The parent requesting the modification has a "heavy burden" to prove that a modification is warranted because "once the custody of children has been fixed it should be disturbed only for the most cogent reasons." *Id.* The paramount consideration is the best interests of the child. *In re Marriage of Leyda*, 355 N.W.2d 862, 865 (Iowa 1984).

At the outset, we acknowledge that these children have two parents who love them and two stepparents who want to be actively involved in the children's lives. That said, after considering the evidence and testimony, we agree with the district court that Bryan has shown by a preponderance of the evidence that Laura's actions constitute a material and substantial change in circumstances. Bryan has also shown that he can minister more effectively to the children's needs.

The district court, in a detailed opinion, listed pages of examples showing how Laura failed to support Bryan's relationship with the children. Then, the court concluded that Laura's actions harmed Bryan's relationship with the children, constituting a material and substantial change in circumstances. *See In re Marriage of Downing*, 432 N.W.2d 692, 694 (Iowa Ct. App. 1988) (noting that our court has previously "held the custodial parent['s] lack of cooperation with the noncustodial parent's efforts to maintain satisfactory visitation and communication with the children evidenced a substantial change in circumstances warranting modification of the dissolution decree"). The court found these changed circumstances were not contemplated at the time of the decree and are more or

less permanent. *See id.* ("When entering the original decree, the court no doubt understood certain natural animosities exist during a divorce, however it strains credulity to believe the trial court did not contemplate the parties, mature adults, overcoming these feelings to concentrate on the best interests of their [children]."). While the parties' communication about scheduling improved once they began using the online calendar, Laura made no efforts to improve her co-parenting relationship with Bryan, and we agree with the district court that "Laura appears oblivious of any harm her public campaign against Bryan may have on her children."

The court found that while the children are physically healthy and doing well in school, Bryan offered superior care to the children because he is better able to facilitate a relationship between the children and both parents and he is willing to co-parent with Laura and set aside any negative feelings he has about her to focus on the children's wellbeing. *See In re Marriage of Grantham*, 698 N.W.2d 140, 146 (Iowa 2005) ("Even though the parents are not required to be friends, they owe it to the child[ren] to maintain an attitude of civility, act decently toward one another, and communicate openly with each other. One might well question the suitability as custodian of any parent unable to meet these minimum requirements." (citation omitted)). Bryan has shown a willingness to work through conflict and improve his relationships with his children, and he remains open to improving his co-parenting relationship with Laura.

With extensive evidence of Laura's disdain for Bryan and her efforts to undermine his relationship with the children on one hand and Bryan's mature and sensitive responses to stay engaged with the children on the other, we agree with

the district court's detailed analysis.  For these reasons, we affirm the trial court's detailed and well-reasoned modification order.

B. **Appellate Attorney Fees.**  An award of appellate attorney fees is not a matter of right but rests within the court's discretion.  *See In re Marriage of Benson*, 495 N.W.2d 777, 779 (Iowa Ct. App. 1992); *see also* Iowa Code § 598.36 (2018) ("In a proceeding for a modification of an order or decree under this chapter the court may award attorney fees to the prevailing party in an amount deemed reasonable by the court.").  We will "consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal." *Ales*, 592 N.W.2d at 704.  After considering the relevant factors and noting Laura has not prevailed on appeal we decline to award Laura appellate attorney fees.

**IV.  Disposition.**

We affirm the district court modification order.

**AFFIRMED.**